IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Jason Berdeau, | ) | C/A No.: 4:17-cv-02744-DCC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Schaeffler Group, USA Inc. and Blue | ) | |
| Cross Blue Shield of South Carolina, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**OPINION AND ORDER**

Pending before this Court are the parties' Cross-Memoranda In Support of Judgment. ECF Nos. 24, 25, 26. Defendants filed Replies to Plaintiff's Memorandum. ECF Nos. 27, 28. Plaintiff Jason Berdeau alleges that he was a participant in his employer's, Schaeffler Group, USA Inc.'s ("Schaeffler"), self-funded health plan (the "Plan") and that he was entitled to recover benefits pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 *et seq*. Specifically, Plaintiff alleges that he requested pre-authorization for certain medical procedures and/or services under the Plan and that his pre-authorization request was improperly denied by Defendants as not being medically necessary. Plaintiff alleges a cause of action against both Defendants for recovery of ERISA benefits under 29 U.S.C. § 1132(a)(1)(B)

(First Cause of Action).[1]

The parties entered into and filed a Joint Stipulation agreeing: that Plaintiff exhausted all of his administrative remedies under the Plan, to the contents of the administrative record, to the applicable Plan terms, that the Court should apply an abuse of discretion standard of review as to the determination of medical necessity, and that the Court may dispose of Plaintiff's claim based on the Joint Stipulation, the administrative record and the parties' Memoranda In Support of Judgment. ECF 19.

The principal issue before this Court is whether the Plan's final claim decision that the medical procedure and/or service for which Plaintiff sought preauthorization was not Medically Necessary was proper under the abuse of discretion standard of review. Based on the arguments contained in the parties' Memoranda in Support of Judgment, the joint stipulation and the administrative record, the Court finds that the Plan's denial of Plaintiff's request for pre-authorization was proper and not an abuse of discretion.

**FINDINGS OF FACT**

The Court makes the following findings of fact pursuant to Federal Rule of Civil Procedure 52 based on the administrative record and the parties' Joint Stipulation:

**1.     The Schaeffler Plan**

Plaintiff's employer, Schaeffler, established and/or maintained an ERISA governed, self-funded group health plan for the benefit of its employees. AR 64-152. Schaeffler was both the Plan Sponsor and Plan Administrator and at all times acted as

---

[1] By order dated May 23, 2018, the Court granted Defendants' motions to dismiss Plaintiff's ERISA breach of fiduciary duty claim.  ECF 23.

the claims fiduciary retaining the right to make final claim determinations under the Plan. AR 80-81, 127, 129, 136. Schaeffler contracted with Defendant Blue Cross Blue Shield of South Carolina ("BCBSSC") to provide administrative claims payment services under the Plan.  AR 137.  BCBSSC provided administrative claims payment services only and did not assume any financial risk or obligation with respect to claims.  As an eligible employee, Plaintiff was a participant in the Plan.

## 2.    Plaintiff's Claim

On or about February 24, 2017, McLeod Spine Center at McLeod Regional Hospital ("McLeod") on behalf of Plaintiff, faxed Defendant BCBSSC seeking pre-authorization for an anterior lumbar fusion at L5/S1, CPT codes 22558, 22845 and 22853. AR 286-92.

On March 7, 2017, Lena Bretous, M.D., a board-certified medical director at BCBSSC, reviewed Plaintiff's lumbar fusion claim and found that the requested procedure was not medically necessary.  AR 319.  Dr. Bretous opined:

> Deny as not medically necessary the requested lumbar fusion procedure for member with back pain x 2 months with failed pain medications and epidural injections, based on Plan medical criteria, because the member has MRI confirmed no central canal stenosis at L5-S1 and no spondylolisthesis or rapidly progressive signs of motor loss or cauda equina syndrome; and no failed trial of 6 weeks of physical therapy in the past 6

months as required by Plan medical Policy CAM[2] 701141[3] coverage requirements. The Plan confirmed that member has quit smoking x 6 weeks.

(AR 319) (footnotes not in original).

On March 7, 2017, McLeod contacted BCBSSC and requested a peer to peer review between Dr. Bretous and McLeod physician, Willie S. Edwards, Jr., concerning the requested lumbar fusion procedure. (AR 822). On March 9, 2017 a telephone peer to peer review took place between Drs. Bretous and Dr. Edwards. (AR 874). Contemporaneous notes of this peer to peer conversation by Dr. Bretous stated:

> First attempt: spoke to Austin; placed on hold; regarding denied ALIF [anterior lumbar interbody fusion] at L5-S1 for indication of DDD [degenerative disc disease] and HNP [herniated nucleus pulposus] after failed epidural injection, no 6 week trial of PT [physical therapy] and member quit smoking x 6 weeks. Per plan medical policy fusion procedure for symptomatic DDD with HNP. Spoke directly with Dr. Edwards; who analyzed adjacent segment disease above L5 and may not be a good candidate for fusion procedure at level below; member came from a

---

[2] CAMs are medical policies assembled by BCBSSC as part of its duties as the third-party claims processor. CAMs aggregate the most current peer-reviewed medical literature on a given medical procedure or services, and make recommendations regarding criteria for medical necessity and/or the investigational (experimental) nature of services based on the consensus of the medical community. The CAMs state: "This medical policy was developed through consideration of peer-reviewed medical literature generally recognized by the relevant medical community, U.S. FDA approval status, national accepted standards of medical practice and accepted standards of medical practice in his community, Blue Cross and Blue Shield Association technology assessment program (TEC) and other non-affiliated technology evaluation centers, reference to federal regulations, other plan medical policies, and accredited national guidelines." AR 642.

[3] The relevant pages of CAM 701141 can be found at AR 1262-64.

previous PCP [primary care provider] who put member through PT [physical therapy] as well as injection, Dr. Edwards understands reason for denial. Denial upheld on peer to peer.

AR 874.

On or about March 10, 2017, BCBSSC received a fax request for pre-authorization for the approval of durable medical equipment ("DME") known as an osteogenesis stimulator E0748 and a lumbar sacral orthosis L0637 from Palmetto Medical Equipment of Florence. AR 646. On that same date, Dr. Bretous conducted a medical review of the DME claim and found that the DME claim was also not medically necessary. (AR 859). Dr. Bretous found:

Deny as not medically necessary the requested bone growth stimulator and back brace for post-operative use because the authorization for the requested lumbar fusion was denied as not medically necessary upon medical review and upheld on peer to peer discussion with the requesting physician. Plan medical policy for lumbar fusion for an indication of severe, symptomatic lumbar degenerative disc disease is considered investigational and not approved for coverage. Therefore, the associated equipment for post-surgical therapy is also denied as not medically necessary.

AR 859.

On March 10, 2017, BCBSSC wrote Plaintiff, Rakesh P. Chokshi, M.D., and Palmetto Medical Equipment of Florence that Plaintiff's DME claim was denied because it was not medically necessary and investigational. AR 824-35. The letters stated in relevant part:

Deny as not medically necessary the requested bone growth stimulator and back brace for post-operative use because the authorization for the requested lumbar fusion was denied as not medically necessary upon medical review and upheld on peer to peer discussion with the requesting physician. Plan medical policy for lumbar fusion for an indication of severe, symptomatic lumbar degenerative disc disease is considered investigational and not approved for coverage. Therefore, the associated

equipment for post-surgical therapy is also denied as not medically necessary.

AR 824.[4]

On March 29, 2017, BCBSSC wrote Plaintiff, Dr. Edwards and McLeod that the request for pre-authorization for the anterior lumbar interbody fusion had been denied because it was not medically necessary. AR 836-49. These letters stated in relevant part:

> [The] Medical Director has reviewed the service request for Spinal procedure 22558, 22845, 22853. We regret that we are unable to authorize the service request scheduled for 03/08/0217 for the following reason:
>
> The clinical and treatment information we received did not meet medical necessity criteria. According to the physician:
>
> Deny as not medically necessary the requested lumbar fusion procedure for member with back pain x 2 months with failed pain medications and epidural injections, based on Plan medical criteria, because the member has MRI confirmed no central canal stenosis at L5-S1 and no spondylolisthesis or rapidly progressive signs of motor loss or cauda equina syndrome; and no failed trial of 6 weeks of physical therapy in the past 6 months as required by Plan medical policy CAM 701141 coverage requirements. The Plan confirmed that member has quit smoking x 6 weeks.
>
> Medically Necessary/Medical Necessity: healthcare services that a Provider, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are:
>
> 1. In accordance with generally accepted standards of medical practice;

---

[4] Despite being put on notice of his right to appeal the DME denial in the March 10, 2017 denial letter and a subsequent April 24, 2017 Explanation of Benefits (AR 648-651), Plaintiff never separately appealed the denial of the DME claim. However, because the DME claim was contingent on the lumbar fusion claim, Plaintiff's lumbar fusion claim most probably was encompassed by Plaintiff's appeal of the fusion claim and Defendants have so stipulated.

2. Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease; and,

3. Not primarily for the convenience of the patient or Provider and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.

AR 836-37, 844-45, 847-48.

On April 10, 2017, Plaintiff appealed the denial of the lumbar fusion. AR 302-18.

On April 26, 2017, a specialty matched, independent external review was conducted on Plaintiff's claim by board certified orthopedic surgeon Ryan Gocke, M.D. AR 1045-47. Dr. Gocke found:

Questions

1. Is there sufficient published peer-reviewed data from well-constructed clinical studies to permit scientific conclusion regarding the durable benefit to health outcomes of the requested anterior lumbar interbody fusion L5-S1?

No

2 Based on the clinical Information provided, have all appropriate conservative treatments been tried for this condition?

No

3. Does the MRI demonstrate appropriate findings that would qualify the member for the requested surgery and if so are the imaging findings consistent with the clinical signs and symptoms?

No

4. Given the unique clinical circumstances of the member and utilizing evidence-based guidelines would the requested services be considered medically necessary and standard of care?

No

Rationale:

Per the review of the submitted clinical documentation, this is a 43-year old patient who is appealing the denial of surgery. The medical records indicate that the patient has multilevel degenerative disc changes. The patient has mild degenerative disc disease at L4-5 with moderate right and mild left neural foraminal stenosis. However, all appropriate conservative treatments have not been tried for this condition. The patient has not completed physical therapy, activity modifications, or pain management injections. There is not sufficient published peer-reviewed data from well-constructed clinical studies to permit scientific conclusion regarding the durable benefit to health outcomes of the requested anterior lumbar interbody fusion L5-S1 for this patient. The MRI does not demonstrate appropriate findings that would qualify the member for the requested surgery. No instability is noted. Therefore, given the unique clinical circumstances of the member and utilizing evidence-based guidelines, the requested services would not be considered medically necessary or standard of care.

AR 1045-46.

On April 26, 2017, Michael Lawhead, M.D., a board certified medical consultant with BCBSSC reviewed Plaintiff's anterior lumbar interbody fusion claim and concurred with Dr. Gocke's findings. AR 301. Dr. Lawhead found:

Deny coverage. Specialty matched independent external review has determined that the patient has not completed physical therapy, activity modifications, or pain management injections. There is not sufficient published peer-reviewed data from well-constructed clinical studies to permit scientific conclusion regarding the durable benefit to health outcomes of the requested anterior lumbar interbody fusion L5-S1for this patient. The MRI does not demonstrate appropriate findings that would qualify the member for the requested surgery. No instability is noted. Therefore, given the unique clinical circumstances of the member and utilizing evidence-based guidelines, the requested services would not be considered medically necessary or standard of care. The plan agrees.

Medically necessary/medical necessity: health care services that a provider, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are:

1. In accordance with generally accepted standards of medical or behavioral health practice;

2. Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease;

3. Not primarily for the convenience of the patient, patient, caregiver(s) or provider; and,

4. Not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.

All requirements of the above-referenced definition must be met in order for a health care service to be deemed medically necessary. The failure of a health care service to meet any one of the above referenced requirements means, in the discretion of the corporation . . .

AR 301.

On April 27, 2017, BCBSSC wrote Plaintiff, Dr. Edwards and McLeod that Defendants' denial of the requested lumbar fusion was being upheld on appeal. AR 1048-58.

On May 25, 2017, BCBSSC received a request from Plaintiff's authorized representative for an external review of Plaintiff's requested lumbar fusion claim. AR 918. On July 14, 2017, the Medical Review Institute of America, Inc., an external review organization accredited by the URAC,[5] wrote Plaintiff upholding the denial of Plaintiff's pre-authorization request for anterior lumbar interbody fusion. AR 806-12. This decision stated in relevant part:

<u>Final External Review Decision</u>:

---

[5] URAC is a Washington DC-based non-profit organization that helps promote health care quality through the accreditation of organizations involved in medical care services.

Upon independent review the reviewer finds that the previous adverse determination/adverse determinations should be:

Upheld

The requested L5-S1 anterior lumbar interbody fusion (CPTs 22558, 22845 and 22853) is not considered medically necessary for this patient based on the medical policy, Lumbar Spinal Procedures, #CAM 161.

<u>A Description of the Qualifications of the Reviewer</u>:

Reviewer Code: 3884

This physician reviewer is board certified by the American Board of Orthopaedic Surgery in General Orthopaedic Surgery and completed a Fellowship in Spine surgery. This physician reviewer is a member of the North American Spine Society Evidence Based Medicine Committee. This physician has been in active practice since 1999.

.    .    .

<u>Explanation of Findings</u>:

Per the Medical Policy, Lumbar Spinal Procedures, # CAM 161[6]:
"Single level lumbar fusion with or without decompression is considered MEDICALLY NECESSARY when the following conditions are met:
1) Lumbar back pain, neurogenic claudication, and/or radicular leg pain without sensory or motor deficit that impairs daily activities for at least 6 months; AND --**CRITERIA MET**
2) Failure to improve with at least 6 weeks of appropriate conservative therapy (six months for isolated LBP). Documented failure of at least 6 consecutive weeks of any 2 of the following physician directed conservative treatments
• Analgesics, steroids, and/or NSAIDS--**CRITERIA MET**
• Structured program of physical therapy--**CRITERIA MET**
• Structured home exercise program prescribed by a physical therapist, chiropractic         provider of physician --**CRITERIA MET**
• Epidural steroid injection and or facet injections/selective nerve root blocks; AND—**CRITERIA NOT MET**
3) Imaging studies corresponding to the clinical findings; AND
4) At least one of the following clinical conditions:
• Spondylolisthesis (Neural Arch Defect-Spondylolytic spondylolisthesis, degenerative spondylolisthesis and congenital unilateral neural arch hypoplasia); OR --**CRITERIA NOT MET**

---

[6] CAM 161 replaced CAM 701141 in April 2017 and contained substantially the same criteria. AR 614.

• Evidence of segmental instability-Excessive motion, as in degenerative spondylolisthesis, segmental instability, and surgically induced segmental instability; OR ---**CRITERIA NOT MET**
• Revision surgery for failed previous operation(s) for pseudoarthrosis at the same level at least 6-12 months from prior surgery\*\* if significant functional gains are anticipated; OR---**CRITERIA NOT MET**
• Revision surgery for failed previous operation(s) repeat disk herniations if significant functional gains are anticipated; OR ---**CRITERIA NOT MET**
• Fusion for the treatment of spinal tumor, cancer or infection; OR ---**CRITERIA NOT MET**
• Chronic low back pain or degenerative disc disease (disc degeneration without significant neurological compression presenting with low back pain) must have failed at least 6 months of appropriate active non-operative treatment (completion of a comprehensive cognitive behavioral rehabilitation program is mandatory) and must be evaluated on a case-by-case basis" ---**CRITERIA NOT MET**

In this 44 year old claimant, he does not meet the criteria for the requested service. The patient does not demonstrate any instability or neurological deficit. Therefore, the request is not medically necessary based on the medical policy criteria.

Per the Summary Plan Description, Exclusions section, page 40, Excluded services include:

NOT MEDICALLY NECESSARY SERVICES OR SUPPLIES
Any service or supply that is not Medically Necessary. However, if a service is determined to be not Medically Necessary because it was not rendered in the least costly setting, Covered Expenses will be paid in an amount equal to the amount payable had the service been rendered in the least costly setting."

The prior denial is upheld.

AR 807, 809-10 (footnotes not in original).

3.    **Relevant Plan Language**

The Court finds that the Plan terms are clear and unambiguous. The Plan

states:

**Medically Necessary/Medical Necessity**: health care services that a Provider, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are:

1. In accordance with generally accepted standards of medical or behavioral health practice;

2. Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease;

3. Not primarily for the convenience of the patient, patient's caregiver(s) or Provider; and,

4. Not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.

All requirements of the above-referenced definition must be met in order for a health care service to be deemed Medically Necessary. The failure of a health care service to meet any one of the above referenced requirements means, in the discretion of the Corporation [BCBSSC] or CBA, the health care service does not meet the definition of Medically Necessary/Medical Necessity.

For the purposes of determining Medically Necessary/Medical Necessity:

1. The Corporation and CBA have the discretion to utilize and rely upon any medical and behavioral health (which includes substance use and mental health) standards, policies, guidelines, criteria, protocols, manuals, publications, studies or literature (herein collectively referred to as "criteria"), whether developed by them or others, which in their discretion are determined to be generally accepted by the medical and/or behavioral health community;

2. "Generally accepted standards of medical or behavioral health practice" means United States standards that are based on credible scientific evidence published in peer-reviewed medical and/or behavioral health literature generally recognized by the relevant United States medical or behavioral health community, physician or behavioral health specialty society recommendations, and/or any other factors deemed relevant in the discretion of the Corporation or CBA; and,

3. The Corporation and CBA may use, including but not limited to, Corporate Administrative Medical ("CAM") Policies, Technology Evaluation Center ("TEC") Assessments, Behavioral Health Care

Utilization Management Criteria and/or any Care Guidelines or criteria by MCG Health, LLC or affiliated companies which reflect and are clinically appropriate health care services and generally accepted standards of medical and behavioral health practice. MCG Health, LLC and/or its affiliated companies are independent companies that develop evidence based guidelines and criteria for medical, behavioral health and insurance industries to interpret clinical determinations and determine the Medical Necessity and appropriateness of requested services, procedures, devices and supplies.

AR 78-79.

**Investigational or Experimental**: surgical or medical procedures, supplies, devices or drugs which, at the time provided, or sought to be provided, are in the judgment of the Corporation, not recognized as conforming to generally accepted medical or behavioral health practice in the United States, or the procedure, drug or device:

1. Has not received required final approval in the United States to market from appropriate government bodies;
2. Is one about which the peer-reviewed medical literature in the United States does not permit conclusions concerning its effect on health outcomes;
3. Is not demonstrated in the United States to be superior to established alternatives;
4. Has not been demonstrated in the United States to improve net health outcomes; or,
5. Is one in which the improvement claimed is not demonstrated in the United States to be obtainable outside the Investigational or Experimental setting.

AR 76.

### A. PAYMENT

The payment of Covered Expenses for Benefits is subject to all terms and conditions of the Plan of Benefits and the Schedule of Benefits. In the event of a conflict between the Plan of Benefits and the Schedule of Benefits, the Schedule of Benefits controls. Oral statements cannot alter the terms of the Plan of Benefits or Schedule of Benefits. Covered Expenses will only be paid for Benefits…

4. For which the required Preadmission Review, Emergency Admission Review, Preauthorization and/or Continued Stay Review has been requested and Preauthorization was received from the Corporation (the Member should refer to the Schedule of Benefits for services that require Preauthorization);

5.     That are Medically Necessary;

6.     That are not subject to an exclusion under Article IV of this Plan of Benefits . . .

AR 90.

**ARTICLE IV - EXCLUSIONS AND LIMITATIONS**

THE EMPLOYER'S GROUP HEALTH PLAN WILL NOT PAY ANY AMOUNT FOR THE SERVICES AND PRODUCTS LISTED IN THIS ARTICLE IV EXCEPT: (1) SERVICES ARE RENDERED BY A HEALTH CARE PROVIDER AS PART OF A VALUE-BASED PROGRAM OR (2) IF REQUIRED BY LAW.

.   .   .

**INVESTIGATIONAL OR EXPERIMENTAL SERVICES**
Services or supplies or drugs that are Investigational or Experimental.

.   .   .

**NOT MEDICALLY NECESSARY SERVICES OR SUPPLIES**
Any service or supply that is not Medically Necessary. However, if a service is determined to be not Medically Necessary because it was not rendered in the least costly setting, Covered Expenses will be paid in an amount equal to the amount payable had the service been rendered in the least costly setting.

AR 102, 106-07.

## CONCLUSIONS OF LAW

**1.     Standard of Review**

The parties stipulated that the Court should apply an abuse of discretion standard of review as to the determination of Medical Necessity (as that term is defined in the Plan). ECF 19, Joint Stipulation ¶ 3. Under the Supreme Court's holding in *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), and the Fourth Circuit's holding in *Champion v. Black & Decker*, 550 F.3d 353 (4th Cir. 2008), even if the Court were to assume a structural conflict of interest existed in this matter, the conflict does not change the requirement that

the Court is to review the decision at issue for an abuse of discretion. Therefore, under *Glenn* and *Champion*, a conflict of interest is to be weighed as a factor in determining whether the Plan abused its discretion when it denied Plaintiffs claim. The "conflict of interest" factor "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . ." *Glenn*, 554 U.S. at 117. The factor "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision making irrespective of whom the inaccuracy benefits." *Id*. Thus, "[t]he more incentive for the administrator . . . to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator['s] . . . decision must be and the more substantial the evidence must be to support it." *Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 233 (4th Cir. 1997).

In the present case, the Court finds that the conflict of interest factor should be given relatively little weight. First, although Schaeffler was both the Plan Sponsor and Plan Administrator and at all times retained the right to make final claims determinations under the Plan, Schaeffler hired BCBSSC, who had no financial risk or obligation with respect to the payment of claims to provide administrative claims payment services under the Plan. AR 80-81, 136-37. *See Palmetto Health v. Nucor Corp. Grp. Health Plan,* C/A No. 3:17-cv-02807-RMG, 2018 WL 5300187 (D.S.C. 2018) (holding that while it is true that the employer acted as fiduciary, administrator, and the sole-funder of the plan, the role of the conflict did not affect the reasonableness of the decision where the employer

adopted the well-reasoned determination of its third-party administrator which lacked a direct financial interest in the matter, citing *Champion,* at 359).  Second, the medical reviews of Plaintiff's claim were conducted by multiple independent, board certified medical experts, including two BCBSSC medical reviewers and two independent orthopedic surgeons, who had no incentive, financial or otherwise, to deny Plaintiff's claim. Additionally, and more significantly, the independent external reviews were blindly assigned to appropriately matched medical specialists, with one of the experts even giving an attestation that he had no conflict of interest in reviewing Plaintiff's claim. AR 1046. Finally, the medical experts reviewing Plaintiff's claim relied on Plaintiff's own medical records and established CAM policies that were referred to in the Plan in the process of reviewing Plaintiff's claim. The Court finds that while a potential structural conflict of interest existed, the safeguards mentioned above mitigated against giving the potential conflict any great weight.

## 2.    The Burden of Proof

The Court finds that Plaintiff had the burden of proving that the services he was requesting were Medically Necessary and therefore a "Covered Expense" under the terms of the Plan. AR 90. If the claimant satisfied this burden, the burden shifted to the Plan to show that some exclusion applied which precluded payment of benefits. *Catledge v. Aetna Life Ins. Co.*, 594 F. Supp. 2d 610 (D.S.C. 2009); *see also Band v. Paul Revere*, 14 F. App'x 210 (4th Cir. 2001) (a plaintiff has the burden of proving entitlement to benefits the terms of an ERISA plan); *Tucci v. First Unum Life Ins. Co.*, 446 F. Supp. 2d 473 (D.S.C. 2006); *Fuja v. Benefit Trust Life Insurance Company*, 18 F.3d 1405, 1408 (7th Cir. 1994) (ERISA plaintiff has burden of proving coverage); *see also Gable v. Sweetheart*

*Company, Inc.*, 35 F.3d 851, 855-56 (4th Cir. 1994) (ERISA plaintiff bears the burden of proving their employer's ERISA plan contains a promise to provide vested benefits), *Lown v. Continental Cas. Co.*, 238 F.3d 543 (4th Cir. 2001) (applying de novo standard of review holding that insurer properly denied the plaintiff's claim where the plaintiff failed to meet her burden of proving that she was totally disabled under the terms of a long-term disability plan).

**3. Plaintiff's Claim**

The Court finds that the Plan's claim determination was the result of a deliberate, principled reasoning process and was supported by substantial evidence. Under the abuse of discretion standard, an administrator's decision will not be disturbed if it is reasonable, even if the reviewing court would have come to a different conclusion independently. *See, e.g., Evans*, 514 F.3d at 323; *Smith v. Cont'l Cas. Co.*, 369 F.3d 412, 417 (4th Cir. 2004); *Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 522 (4th Cir. 2000). "[A] decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997); *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir. 1995). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion" and which "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197, 208 (4th Cir. 1984). A reviewing court must assess the reasonableness of the administrator's decision based on the facts known to the administrator at the time of the decision. *See, e.g., Elliott v. Sara Lee Corp.*, 190 F.3d 601, 608-09 (4th Cir. 1999).

A reviewing court may consider various factors to assess the reasonableness of the administrator's decision. These factors include (but are not limited to): (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision-making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have. *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342 (4th Cir. 2000). The *Booth* factors are best viewed "as more particularized statements of the elements that constitute a deliberate, principled reasoning process and substantial evidence . . . ." *Donnell v. Metro. Life Ins. Co.*, 165 Fed. Appx. 288, 294 n.6 (4th Cir. 2006) (unpublished) (quotations omitted).

**a.    Language of the Plan**

The Court finds that BCBSSC's interpretation of the definition of Medical Necessity and the exclusions contained in the Plan was supported by the Plan's unambiguous language. Subject to ultimate approval by Schaeffler, the Plan clearly gave BCBSSC discretion to determine medical necessity and authorized the use of standards, policies, guidelines, and criteria, including, but not limited to, CAM policies to determine clinically appropriate health care services and generally accepted standards of medical health practice. The Court further finds that BCBSSC's use of the above criteria to interpret clinical determinations and make recommendations regarding the medical necessity and

appropriateness of Plaintiff's requested procedure and medical devices was consistent with the terms of the Plan and was not an abuse of discretion. Finally, the Court notes that while Plaintiff alleges that he is entitled to benefits, Plaintiff makes no allegation that BCBSSC misinterpreted the terms of the plan. Accordingly, the Court finds that first *Booth* factor weighs in Defendants' favor.

**b.    The Purposes and Goals of the Plan**

The Court finds that the purpose of the Schaeffler Plan was to offer self-funded health coverage to its employees as an employee benefit. Accordingly, the goal of the Plan was to provide a maximum benefit to those covered within the available resources. To meet this goal, the Plan had to be constructed to ensure that claims submitted for covered services were paid. At the same time, the Plan had to be constructed to exclude from coverage other services such as those considered not Medically Necessary and Investigational or Experimental. As can be seen by the definition of Medically Necessary, to be payable, the service had to be in accordance with generally accepted standards, clinically appropriate and not more costly than an alternative service at least as likely to produce equivalent results. Services that were not Medically Necessary and/or were Experimental or Investigational in addition to not being covered were specifically excluded under the terms of the Plan. AR 76, 78-79, 106-107.

In the present case, the evidence in the record, including peer-reviewed standards, policies, guidelines, and criteria; the opinions of two in-house board certified BCBSSC medical reviewers; and two board certified independent specialist medical reviewers determined that Plaintiff's requested procedure and/or DME were not Medically Necessary and/or were Experimental or Investigational. Because the purpose of the Plan

was to allow only benefits for services and/or DME that were Medically Necessary and/or not Experimental or Investigational, the Court finds that BCBSSC's recommendation to deny Plaintiff's claim was consistent with the purposes and goals of the Plan.

**c.    Adequacy of the Materials Considered to Make the Decision and the Degree to Which They Support It.**

The Court finds that the Plan's claim determination was supported by substantial medical evidence and was not an abuse of discretion. As was previously discussed, this evidence included peer-reviewed standards, policies, guidelines, and criteria, including CAM policies; the opinions of two in-house board certified BCBSSC medical reviewers; and two board certified independent specialist medical reviewers who all found that Plaintiff's requested procedure and/or DME were not Medically Necessary and/or were Experimental or Investigational.

First, Plaintiff's own objective diagnostic MRI on January 1, 2017, indicated that while Plaintiff had mild DDD with minimum disc protrusion at L5-S1, Plaintiff had no central canal compromise, no canal stenosis and no neural impingement. AR 317.  On February 21, 2017, Plaintiff's treating physician, Dr. Edwards, found that Plaintiff had no evidence of instability at L5-S1, had 90 flexion in the lumbar region, had a motor strength 5 out of 5 bilaterally with normal symmetric 2+ reflexes, and had no abnormal gait or long tract findings. AR 313. While Dr. Edwards advocated for Plaintiff to receive the requested lumbar fusion, Dr. Edwards' opinion was not supported by the objective medical evidence. "Courts in the Fourth Circuit routinely hold that it is not an abuse of discretion for an ERISA-regulated plan's claim administrator to deny benefits unsupported by objective evidence." *Collins v. Qwest Disability Plan*, C/A No. 7:06-cv-1128-HMH, 2006 WL 2946466 (D.S.C. 2006) (internal quotations marks and citation omitted). Accordingly, the

Court finds that BCBSSC did not abuse its discretion in failing to give Dr. Edward's opinion controlling weight.

Second, the Court finds that the fact that Dr. Edwards believed that the requested procedure was medically necessary was not binding on the Plan. Under an abuse of discretion standard of review, the Plan was not obligated to give greater weight to the opinions of Plaintiff's treating physicians. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003); *Elliot v. Sara Lee Corp.*, 190 F.3d 601 (4th Cir. 1999). Plans are not bound by the opinion of a treating doctor in determining medical necessity. *See Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.,* 32 F.3d 120, 125 (4th Cir. 1994) (In determining benefits, "the very judgment of the treating doctor as to the medical necessity of the prescribed treatment is being assessed by the Plan administrator and its medical consultants. To require the Plan to give conclusive weight to the opinion of the treating physician would deprive it of its role in determining medical necessity"); *Free v. Travelers Ins. Co.,* 551 F. Supp. 554, 560 (D. Md. 1982) ("the plaintiff's unfettered right to select a physician and follow his advice does not create a corresponding responsibility in the defendant to pay for every treatment so chosen . . . [t]o require insurers to pay for every remedy, proven or unproven, prescribed by a physician, could invalidate the actuarial basis of current premium rates"); Unlike the opinions of the independent medical reviewers, the BCBSSC in-house medical reviewers and the BCBSSC CAM policies, Dr. Edward's opinion was merely conclusory and failed to address the requirements of the Plan's definition of Medically Necessary and address the required Plan criteria. Therefore, the Court finds that BCBSSC did not abuse its discretion in failing to give Dr. Edward's opinion controlling weight.

Third, the Court finds that the Plan did not abuse its discretion in giving greater weight to the opinions of the two independent, board certified orthopedic surgeons, Dr. Gocke and the medical reviewer from Medical Review Institute of America, who both opined that the requested DME and/or services were not medically necessary and/or were investigational. *See* AR 806-812, 1045-1047. These reviewers were neutral, appropriately matched specialists who properly applied the terms of the Plan and the applicable plan criteria. The Court finds that BCBSSC's recommendation giving these opinions greater weigh was not an abuse of discretion.

Fourth, the Court finds that the Plan did not abuse its discretion in relying on the opinions of BCBSSC's own board certified medical reviewers, Drs. Bretous and Lawhead. *See* AR 301, 319, 859, 874. Both Drs. Bretous and Lawhead reviewed Plaintiff's medical records and applied the terms of the Plan and the Plan authorized peer-reviewed standards, policies, guidelines, and criteria, including CAM policies to come to the conclusion that Plaintiff's requested procedure and DME were not medically necessary. Because the Plan was self-funded and BCBSSC was not the insurer of the Plan, the Court finds that Drs. Bretous and Lawhead were neutral experts. Accordingly, the Court finds that the Plan's reliance on Drs. Bretous' and Lawhead's opinions and the applicable BCBSSC CAM policies was not an abuse of discretion. *See Martin v. Blue Cross Blue Shield of Virginia*, 115 F.3d 1201 (4th Cir. 1997) (upholding the denial of benefits for high dose chemotherapy and peripheral stem cell rescue as being experimental based in part on a Blue Cross Blue Shield of Virginia TEC assessment); *Evans v. Blue Cross Blue Shield of South Carolina*, 834 F. Supp. 887 (D.S.C.1993) (upholding the denial of benefits

for a radial keratotomy based on a BCBSSC TEC assessment and the opinion of BCBSSC's Medical Director).

Fifth, the Court finds that BCBSSC did not abuse its discretion in choosing between conflicting medical evidence. The Fourth Circuit has held it is not an abuse of discretion for a plan fiduciary to deny benefits where conflicting medical reports are presented. *Elliot*, 190 F.3d 601 (4th Cir. 1999); *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228 (4th Cir. 1997) (finding no abuse of discretion in fiduciary's denial of benefits where claimant's primary medical provider's finding of disability conflicted with reports of independent panel of medical specialists); *Brogan v. Holland*, 105 F.3d 158 (4th Cir.1997) (affirming district court's grant of summary judgment for trustees where medical evidence was conflicting as to whether the plaintiff's stroke occurred during course of employment). The Court finds that the fact that BCBSSC gave more weight to the objective medical findings; the opinions of two independent, board-certified orthopedic surgeons; the opinions of two board-certified in-house medical reviewers and peer-reviewed CAM policies; all of which specifically addressed the terms of the Plan and the Plan criteria; over the conclusory opinions of Plaintiff's treating physician was not an abuse of discretion.

Additionally, the Court finds that Plaintiff did not engage in sufficient physical therapy to meet the Plan's medical necessity criteria. The Plan's Medical Necessity criteria required that Plaintiff attempt at least 6 weeks of physical therapy. AR 319, 614, 1262-64. However, Plaintiff stated that she engaged in physical therapy from March 23, 2017, through April 5, 2017, ECF 26 at 4, and the records of Hartsville Physical Therapy and Rehabilitation Center indicated that Plaintiff engaged in 22 days of physical therapy from March 14, 2017, through April 5, 2017, AR 933-37. While it is undisputed that Plaintiff did

engage in some physical therapy, the Court finds that Plaintiff did not engage in 6 weeks of physical therapy as was required by the Plan criteria.[7, 8]

Likewise, the Court further finds there was substantial evidence in the record that Plaintiff did not complete the required course of pain management injections. According to the evidence in the administrative record, Plaintiff received one epidural steroid injection on February 8, 2017. AR 942. No other steroid injections were noted in the record. Accordingly, the Court finds that Plaintiff failed to meet the required 6 weeks of conservative care required by the criteria. AR 614, 1262-64.[9]

The Court also finds there was no evidence in the administrative record that Plaintiff's daily activities were impaired for 6 months or that Plaintiff suffered significant functional impairment for 3 months which also were requirement of the Medical Necessity criteria. AR 614, 1262-64. [10]

The Court notes that while there was some variation in the opinions of the reviewing physicians as to which particular criteria Plaintiff met, all of the reviewing physicians unanimously found that Plaintiff failed to meet the required combination of Medical Necessity criteria for the requested procedure and durable medical equipment to

---

[7] This conclusion also was supported by BCBSSC's board certified in-house medical reviewers, Drs. Bretous, AR 319, 859, and Lawhead, AR 301, as well as independent, board certified orthopedic surgeon Dr. Ryan Gocke, AR 643-44.

[8] There was also no evidence in Plaintiff's records that Plaintiff engaged in a home exercise program prescribed by a physical therapist, chiropractic provider or physician which was also one of the criteria. AR 614.

[9] This conclusion was supported by the expert opinions of Drs. Gocke, AR 1045-47, Lawhead, AR 301, and the Medical Review Institute of America, Inc. orthopedic spine surgeon, AR 807, 809-10.

[10] Drs. Gocke and Lawhead both opined that there was no evidence that Plaintiff suffered activity modifications. AR 301, 1045-47.

be covered by the Plan. The fact that BCBSSC chose to give greater weight to a particular finding contained in one or more of these opinions did not amount to an abuse of discretion. *See Elliot*, 190 F.3d 601 (4th Cir. 1999) (it is not an abuse of discretion for a plan fiduciary to deny benefits where conflicting medical reports are presented).

Plaintiff argues that he should prevail based on the Fourth Circuit's holding in *DuPerry v. Life insurance Co. of N. Am.*, 632 F. 3d 860 (4th Cir. 2011). However, the Court disagrees and finds that Plaintiff's reliance on *DuPerry* is misplaced because *DuPerry* can be easily distinguished. First, *DuPerry* involved a claim for long term disability benefits due to fibromyalgia, and not a claim for determining medical necessity based on established medical necessity criteria. Second, the claim administrator in *DuPerry* was also the insurer of the plan. Therefore, the Fourth Circuit found that this conflict of interest weighed heavily against LINA. Here, although Defendant Schaeffler was both the Plan Sponsor and Plan Administrator and at all times retained the right to make final claims determinations under the Plan, Schaeffler hired BCBSSC, who had no financial risk or obligation with respect to the payment of claims, to provide administrative claims payment services under the Plan. AR 80-81, 136-37. Accordingly, the structural conflict of interest in the present case did not weigh heavily against Defendants. Third, in *DuPerry*, the Court found that LINA's medical reviewers' opinions ignored the plaintiff's subjective complaints of pain and were merely conclusory. Here, BCBSSC relied on the opinions of four board certified medical reviewers who made specific findings addressing established Plan Medical Necessity criteria using Plaintiff's own medical records and objective medical evidence. On the other hand, Plaintiff's treating physician made conclusory statements that did not address the Plan criteria, and were inconsistent with

Plaintiff's own medical records and objective medical evidence. As a result, the Court finds that *DuPerry* is distinguished and has no application to the facts of this case.

The Court's review of the administrative record establishes that the Plan's decision to deny Plaintiff's claims resulted from a process that was deliberate and principled. There was substantial evidence in the administrative record indicating that Plaintiff failed to meet the required Medical Necessity Plan criteria. Therefore, the surgical procedure and durable medical equipment requested by Plaintiff was not in accordance with generally accepted standards of medical practice, and was not clinically appropriate, in terms of type, frequency, extent, site and duration, and was not considered effective for the patient's illness, injury or disease, and therefore was not Medically Necessary. BCBSSC reviewed all medical records submitted by Plaintiff and/or his providers. Multiple medical reviews were performed on Plaintiff's claim by board certified physicians including independent external specialists. BCBSSC applied unambiguous Plan terms and specifically approved, peer-reviewed criteria in reviewing Plaintiff's claims. Plaintiff and/or his providers were given ample opportunity to submit any evidence they desired to support Plaintiff's claims and his appeals. Plaintiff and/or his providers even availed themselves to a peer to peer call and an external medical review. At all times during the claim, Plaintiff was kept apprised of the status of the claim and written communications with Plaintiff fully informed Plaintiff of his ERISA rights. Accordingly, the Court finds that the Plan's claim determination was deliberate, principled and was not an abuse of discretion. *See Donnell v. Metro. Life Ins. Co.,* 165 Fed. Appx. 288, 294-95 (4th Cir. 2006) (approving of decision making process that included review of all submitted medical evidence, measurement of claimant's vocational abilities, an independent medical

evaluation, and timely notice of claim status); *see Hensley v. IBM*, 123 Fed. Appx. 534, 538 (4th Cir. 2004) (record demonstrated decision to terminate benefits resulted from a deliberate, principled reasoning process where administrator issued multiple requests for information from claimant's physicians, conducted several reviews of her medical records by independent consultants, and, on appeal, gave consideration to claimant's supplemental medical evidence); *Tucci v. First Unum Life Ins. Co.,* 446 F. Supp. 2d 473, 484-85 (D.S.C. 2006) (review process "deliberate and principled" where insurer obtained input from treating physicians, obtained multiple medical reviews of claimant's records, reviewed all medical records, offered claimant the opportunity to provide supplemental medical evidence, advised claimant of her rights, and kept claimant apprised of the status of her claim).

**d.    Whether the Fiduciaries Interpretation Was Consistent With the Other Provisions In The Plan and Earlier Interpretations of The Plan.**

As was previously discussed, the Court holds that BCBSSC's interpretation was consistent with the terms of the Plan. The Court also finds that Plaintiff failed to submit any evidence that the BCBSSC's interpretation was inconsistent with any prior interpretations. Accordingly, this *Booth* factor weighs in Defendants' favor.

**e.    Whether The Decision-making Process Was Reasoned and Principled.**

As was previously discussed, the Court holds that the Plan's claim determination was reasoned and principled.

**f.    Whether The Decision-making Process Was Consistent With The Procedural and Substantive Requirements of ERISA.**

The Court's review of the administrative record indicates that there were no procedural irregularities during the claim. Plaintiff was kept informed as to the status of

his claim. The denial letters fully and/or substantially complied with the requirements of the ERISA claim regulations. Once the claim was initially denied, Plaintiff was given opportunities to appeal and supply BCBSSC with supporting documentation. Accordingly, the Court finds that the Plan fully complied with the procedural and substantive requirements of ERISA.

**g.      Any External Standard Relevant to The Exercise of Discretion.**

The Court finds that no party submitted any evidence of any external standard relevant to this case. Therefore, the Court finds that this *Booth* factor is not applicable to this case.

**h.      The Fiduciary's Motives and Any Conflict of Interest It May Have.**

As this Court previously discussed in its holding concerning the applicable standard of review, the Court finds that while a potential structural conflict of interest existed, the safeguards mentioned above mitigated against giving the potential conflict any great weight.

**i.      Evidence Outside of The Administrative Record**

The parties stipulated in the Joint Stipulation that Plaintiff's claim can be decided on the administrative record, and no party argued that evidence outside of the administrative record should be considered by the Court. Therefore, the Court finds that this *Booth* factor does not apply to this case.

**III. CONCLUSION**

After careful consideration of the relevant Memoranda In Support of Judgment, the administrative record and the Joint Stipulation, the Court determines that the Defendants engaged in a deliberate, principled reasoning process and that their decision was

supported by substantial evidence that the services requested by Plaintiff were not Medically Necessary and/or were Experimental or Investigational under the terms of the Plan. Therefore, for the reasons set out herein, is hereby ordered that Defendants' Motions for Judgment are granted and that Plaintiff's Motion for Judgment is denied.

**IT IS SO ORDERED**.

s/ Donald C. Coggins, Jr.
United States District Judge

May 16, 2019
Spartanburg, South Carolina